## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM C. STILLWAGON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:11-cv-1338 |
| | ) | |
| v. | ) | |
| | ) | Judge Mark R. Hornak |
| INNSBROOK GOLF & MARINA, | ) | |
| LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

This case started as a straightforward breach of contract action. As the litigation process has unfolded, it has expanded to a multi-national, multi-state, multi-party, multi-claim battle having its foundation in the once mutually lucrative and now quite stormy relationship between the Plaintiff, William C. Stillwagon, a Pennsylvania lawyer, and the multifaceted North Carolina property development enterprises controlled by two Austrian businessmen, Alois and Richard Rieder ("Rieders").

Originally, this case consisted of Stillwagon's claim that the Rieders (and their corporate operations) reneged on their substantial financial obligations to him under a written severance agreement, entered into when he and they parted ways after decades of doing business together. Now, the Rieders and their businesses have turned the tables on Stillwagon by asserting a sweeping array of counterclaims against Stillwagon. They seek to not only invalidate the severance deal, but to recover damages from Stillwagon for what they say are a multitude of business harms that his malicious stewardship of their projects inflicted on them. Suffice it to say that there are plenty of sour grapes all around.

Now, pending before the Court is a second Motion to Transfer Venue of this case from this District to the United States District Court for the Eastern District of North Carolina filed by the Rieders, ECF No. 59, and Plaintiff's Motion to Dismiss the Counterclaims of Defendants Rial Corporation ("Rial") and Innsbrook Golf & Marina, LLC ("Innsbrook").[1] ECF No. 54. Rial and Innsbrook join in the Rieders' Motion to Transfer this action.[2] ECF No. 63. These matters, having been fully briefed by the parties and oral argument having been presented, are ripe for disposition. For the reasons which follow, the Motion to Dismiss the Counterclaims is granted in part and denied in part, and the Motion to Transfer Venue to the Eastern District of North Carolina is granted.

## I. FACTS

Plaintiff William C. Stillwagon ("Stillwagon"), a Pennsylvania resident, brings a breach of contract claim against the Corporate Defendants as well as Alois and Richard Rieder. According to the Plaintiff, the Rieders are residents of Austria and the principal owners of two foreign companies: Watersprings Development ("Watersprings") of Switzerland and Nufin Anstalt of Liechtenstein. These companies are shareholder owners of Rial, a North Carolina corporation.[3] Rial is, in turn, the sole shareholder of Innsbrook, a limited liability company organized under the laws of North Carolina.

In 1980, Stillwagon began providing personal services to the Rieders and their companies. He executed real estate deals, which included the purchase, development, and resale of numerous properties in North Carolina -- including in Hyde, Dare, and Bertie Counties. He

---

[1] Rial and Innsbrook will be referred to cumulatively as the "Corporate Defendants." These facts are taken from the assertions made by Stillwagon in his Amended Complaint, and by the Corporate Defendants in their Counterclaims.

[2] The Court grants the Corporate Defendants' Motion for Joinder. ECF No. 63.

[3] According to the Corporate Defendants, Seg Anstalt and Nufin Anstalt transferred their interest in Rial to Watersprings on October 6, 2010. ECF No. 52 at 11. Also, Watersprings Development is the sole shareholder of Rial, and Rial is the sole member of Innsbrook. ECF No. 51 at ¶ 10.

2

managed and supervised the development of multiple North Carolina properties. Stillwagon created, operated and managed Innsbrook to own and operate golf courses and other properties. He also managed the finances of the various Rieder Enterprises, and served as Rial's president.

Stillwagon asserts that he performed a substantial part of his services from his office in Greensburg, Pennsylvania and that the Defendants used that location as a satellite corporate office. For instance, Stillwagon had discussions with Arnold Palmer and his representatives in Pennsylvania to discuss the development of an Innsbrook golf course. On other occasions, Stillwagon met with either the Rieders or their representatives in Pennsylvania.

Defendants, however, deny that Stillwagon was engaged to perform any services from his business office in Greensburg and deny that he performed any services from that office.[4] Moreover, Defendants assert that the Rieders' representative met with him in Pennsylvania at Stillwagon's request and only for his convenience.

Stillwagon and the Rieders terminated their employment relationship via a Severance and Release Agreement ("Severance Agreement") on November 9, 2009. ECF No. 11-1. Stillwagon drafted and signed the Severance Agreement in Pennsylvania, Alois Rieder signed it in Austria. Stillwagon and Alois Rieder are the signatories to the Severance Agreement, with Alois Rieder signing it as the "authorized representative" of Richard Rieder, Rial, Innsbrook, Seg Anstalt, Nufin Anstalt, Watersprings, and All Seasons Development, Inc. ("All Seasons").[5] Stillwagon allegedly was then retained as vice president of Rial until April 2010 so that he would turn over all of the Defendants' financial documents. The Severance Agreement called for Stillwagon to

---

[4] If this is the case, given the breadth of Stillwagon's work, his physical location in Pennsylvania, and the large severance amount agreed to, one may wonder whether they were or were not paying attention to what Stillwagon was doing for over three (3) decades.

[5] The Severance Agreement (ECF No. 11-1) collectively designates all of these parties as "Owner" and binds Stillwagon and "Owner" to its terms.

receive four annual installments of $300,000 each, totaling $1.2 million, beginning on April 1, 2010. Stillwagon received the first payment in April 2010. He claims that the Defendants breached the Severance Agreement on April 1, 2011, when they refused to pay the second $300,000 payment. He further alleges that the Defendants have committed an anticipatory breach by expressly refusing to make any future payments under the contract. This equates to a claimed breach stemming from $900,000 in non-payments.

The Corporate Defendants claim to never have directed any activity into the Commonwealth of Pennsylvania in furtherance of performing the Severance Agreement. The Corporate Defendants claim that Stillwagon's duties related entirely to properties located in North Carolina and cite to the Severance Agreement's choice of law clause, which provides:

> This Agreement has been negotiated and executed in the State of North Carolina and is to be performed in the State of North Carolina. This Agreement shall be governed and interpreted in accordance with the laws of the State of North Carolina, including all matters of construction, validity, performance, and enforcement, without regard to North Carolina's conflict of laws rules.

Severance Agreement at ¶ 10.

Furthermore, in their Answer and Counterclaims, the Corporate Defendants allege that during his employment, Stillwagon orchestrated an elaborate fraud and embezzlement scheme with various and sundry North Carolina residents and entities at the expense of, and in order to deceive, Defendants.

The Corporate Defendants allege the following facts in support of the defenses and counterclaims as set forth in their Answer ("Defenses" and "Counterclaims"). ECF No. 51. Stillwagon hired Bobby Jean Ware ("Ware") and his company Bobby Ware Builders ("Ware Builders"), a North Carolina resident and corporation, to perform work for Rial on land development projects in Dare and Bertie Counties, North Carolina. *Id.* at ¶ 118. When Stillwagon incorporated Rial under the laws of North Carolina, he listed its registered office at

4

the same North Carolina address as Ware's. *Id.* at ¶¶ 116-117. In 2004, Stillwagon also incorporated All Seasons under North Carolina law and listed its mailing address as the same North Carolina address as Ware Builders' principal place of business. *Id.* at ¶ 128. Rial was listed as the incorporator of All Seasons even though Stillwagon supposedly did so without the knowledge or authorization of the Rial Board of Directors. *Id.* at ¶¶ 129-30. Stillwagon listed Chris Catron ("Catron"), an employee of Ware and Ware Builders, as All Season's registered agent. *Id.* at ¶¶ 132-33. In 2005, Stillwagon incorporated Innsbrook Homeowners' Association, Inc. ("Homeowners' Association) in North Carolina and listed its principal office at the office location of Ware Builders and All Seasons. *Id.* at ¶¶ 136-38. Stillwagon also maintained at least ten (10) bank accounts in the name of Rial or other related entities without Board approval. *Id.* at ¶ 140.

One of Stillwagon's responsibilities was the development of a residential community and accompanying golf course in Bertie County, North Carolina. *Id.* at ¶¶ 141-42. Stillwagon hired Ware to act as the project's general contractor without a written contract and even though Ware did not possess a general contracting license, which the Corporate Defendants allege was in contravention of North Carolina law. *Id.* at ¶¶ 148-50. Stillwagon then awarded contracts to Ware under several fictitious names either without any competitive bids or while manipulating the bidding process so that Ware and his entities would receive the contracts. *Id.* at ¶¶ 151-53, 207-17. Stillwagon permitted Ware entities to use Rial employees and equipment to perform work, and then charge Defendants for the use of these resources -- essentially double charging Rial. *Id.* at ¶¶ 154. During this time, Stillwagon allegedly refused to obtain an independent audit of Rial's finances, insisting that he continue to perform that accounting work. *Id.* at ¶ 157.

In 2009, Stillwagon requested a formal termination agreement, and then wrote and executed the Severance Agreement. *Id.* at ¶¶ 165-67. Stillwagon failed to advise Defendants to seek independent legal counsel in reviewing the Agreement. *Id.* at ¶ 168. During the drafting of the agreement, Stillwagon represented that he was unaware of and was not involved in any wrongful conduct on the projects. *Id.* at ¶ 169. Generally, the Corporate Defendants seem to suggest that Plaintiff was trying to in essence "get out of Dodge" before the evidence of his fraudulent scheme came to light.

After signing the Severance Agreement, the Defendants say that they discovered bookkeeping flaws that amounted to over $4 million and realized that Plaintiff had been cooking the corporate books. *Id.* at ¶ 158. Also, in 2005 Stillwagon paid himself and Ware $25,000 and $50,000 respectively for claimed commissions on sales that had never occurred. Defendants say that they confronted Stillwagon about all of this, and that Stillwagon assured them in October 2008 that he had returned these funds even though he had not. *Id.* at ¶¶ 168, 181-86. They then demanded the return of the money, and Stillwagon did so in June 2009. *Id.* However, after signing the Termination Agreement, Defendants discovered that in the days following the return of those funds, Stillwagon had wired $25,000 to an account he controlled, along with $50,000 back to Ware, while omitting these wire transfers from the corporate financial documents. *Id.*

Stillwagon also allegedly knowingly made numerous other improper payments to Ware and fictitious entities as embezzlement vehicles -- including Great Atlantic Equipment Leasing, Northeastern Excavating & Underground, Sunny Days Landscaping, and Kris Gray Construction. Defendants discovered that Stillwagon fraudulently paid these companies fees in excess of any payments owed, paid amounts for work that had never been performed, paid multiple entities for the same work or leased equipment, and paid generic invoices without any

6

corroborating documents to Ware Builders even when the invoices were from third-party vendors. *Id.* at ¶¶ 187-89, 192-206. Furthermore, Defendants discovered that Stillwagon improperly authorized lot sales for a fraction of the market price or for no cost at all to his alleged co-conspirators -- including Ware's son, Ware's daughter, and Catron, -- along with five lots to himself. *Id.* at ¶¶ 190-191.

The Corporate Defendants assert that they are still discovering the extent of Stillwagon's scheme because many significant financial documents are missing from the information Plaintiff turned over to Defendants. Also, Defendants claim that they have not been able to access several of the company bank accounts that Stillwagon opened without permission because only Plaintiff's name was listed on the accounts and they have since been closed.[6]

## II.   PROCEDURAL HISTORY

Stillwagon originally filed this suit in the Court of Common Pleas of Westmoreland County, Pennsylvania on September 27, 2011. ECF No. 1-2. Defendants then removed the action to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. ECF No. 1. Stillwagon filed an Amended Complaint on November 14, 2011. ECF No. 11.

The Corporate Defendants then filed a Motion to Dismiss the Amended Complaint for Lack of Personal Jurisdiction or, in the alternative, Transfer Venue. ECF No. 13. This Court denied that Motion on February 14, 2012. ECF No. 34. The Court reasoned that, based on the Complaint's breach of contract claim, the only claim then in front of the Court, transfer was inappropriate because Stillwagon had performed substantial work in Pennsylvania and some portion of the evidence that may become relevant would likely be located here, that there was "no substantial reason to disturb Stillwagon's choice of venue." *Stillwagon v. Innsbrook Golf &*

---

[6] Interestingly, at oral argument, Defendants' counsel confirmed that Defendants had not turned any evidence of this plethora of allegedly fraudulent acts over to state or federal prosecutors in Pennsylvania or North Carolina.

*Marina, LLC*, No. 2:11-CV-1338, 2012 WL 501685, at *5 (W.D. Pa. Feb. 14, 2012) (*"Transfer Opinion I"*).

Stillwagon then filed a Second Amended Complaint on May 4, 2012. ECF No. 47. The Corporate Defendants filed an Answer to the Second Amended Complaint along with Counterclaims on June 1, 2012. ECF No. 51. Stillwagon then filed a Motion to Dismiss Counterclaims pursuant to Rules 12(b)(6) and 12(b)(7). ECF No. 54 (incorporating ECF Nos. 45 and 46). The Corporate Defendants filed a response on July 5, 2012. ECF No. 56 (incorporating ECF No. 52).

On July 27, 2012, the Rieders filed a Motion to Dismiss for Lack of Personal Jurisdiction, Motion for a More Definite Statement or, in the alternative, to Transfer Venue. ECF No. 59. On August 15, 2012, the Corporate Defendants filed a Motion to Join the Rieders' Motion to Transfer Venue and for a More Definite Statement. ECF No. 63. Stillwagon filed his Response to the Rieders' motion, ECF No. 66, and the Rieders filed a Reply. ECF No. 68. This Court held oral argument on all of the outstanding motions on November 15, 2012.

In his Second Amended Complaint, Stillwagon alleges a breach of a written contract (The Severance Agreement), or alternatively, in the event that the Severance Agreement is determined to be void or unenforceable, a breach of an oral contract. Corporate Defendants, in their Answer, assert numerous defenses including, but not limited to, breach of contract, failure to perform, statute of frauds, unclean hands, fraud in the inducement, and lack of consideration. The Corporate Defendants then go on to assert numerous counterclaims: breach of fiduciary duty, breach of contract, unjust enrichment, civil conspiracy, constructive fraud, fraud, misrepresentation, negligent misrepresentation, fraud in the inducement, negligence, unfair and deceptive trade practices, conversion, RICO, and seek a declaratory judgment.

Given the nature of the affirmative defenses and counterclaims, and the new evidentiary issues that they entail, it is appropriate that this Court again consider the Corporate Defendants' Motion to Transfer Venue, notwithstanding *Transfer Opinion I.*[7] However, because this Court out of necessity must focus on the Corporate Defendants' Counterclaims and their Defenses when deciding the Motion to Transfer Venue, the Court believes that it must first consider the Plaintiff's arguments seeking to dismiss the Counterclaims before the Court may consider the transfer of this action to North Carolina, since the transfer issue carries legitimacy only if the Counterclaims have merit. Otherwise, if they do not, they might be advanced by the Corporate Defendants simply as a tactical smokescreen to shift this case to what they may believe are the friendlier confines of a North Carolina court. Thus, the Court will consider Plaintiff's arguments in support of dismissal of the Counterclaims *seriatim.*

Nothing about this case is simple, and that analysis is no different -- it requires a consideration of complex choice of law principles, the substantive law of both Pennsylvania and North Carolina, federal procedural law as developed by our Court of Appeals and by the Fourth Circuit, and finally, the application of venue transfer principles in a situation where a transfer in to one of our Nation's busiest federal trial courts is sought.

---

[7] In *APV N. Am., Inc. v. Trans Indus. Dev. Corp. & Peeples Indus., Inc.*, the district court denied defendants' motion to transfer venue but then later granted defendants' renewed motion to transfer venue after defendants' answer was filed, which included three counterclaims, had been filed. Case 1:05-cv-02396, Doc. No. 71-2 at 1-2 (N.D. Ill. Aug. 21, 2007). In weighing the private and public factors, the court noted that the analysis of its first order on the motion to transfer "implicated only the breach of contract claims in the original complaint" but "[a]s the pleadings now stand, the court must also consider defendants' affirmative defenses and counterclaims." *Id.* at 5. Furthermore, the Third Circuit has suggested that it is proper for a court to consider a defendant's counterclaims when deciding a motion to transfer. In *HB Gen. Corp. v. Manchester Partners, L.P.*, the Third Circuit noted that while a defendant's arguments that the district court's inability to hear its counterclaims was irrelevant to a joinder motion under Rule 19, the court noted that "[d]efendant's argument might be relevant to a motion to transfer venue or to forum non conveniens." 95 F.3d 1185, 1198 n.9 (3d Cir. 1996); *see also Am. Senso Rx, Inc. v. Banner Pharmcaps, Inc.*, No. 06-1929 FSH, 2006 WL 2583450, at *2 (D.N.J. Sept. 6, 2006) (court considered defendant's counterclaims when analyzing motion to transfer, but noted that "this Court's discussion of these counterclaims does not represent any opinion on whether they belong in the case."). Moreover, the Corporate Defendants' Counterclaims appear to arise from the same transactions or occurrences as Plaintiff's breach of contract claims and, alternatively, breach of oral contract claims. Thus, the Counterclaims are likely compulsory. *See* Fed. R. Civ. P. 13(a).

## III. CHOICE OF LAW [8]

Both parties agree that North Carolina law applies to Plaintiffs' breach of written contract claim as well as the Corporate Defendants' defenses to that claim per the choice of law clause in the Severance Agreement. Severance Agreement at ¶ 10; ECF No. 46 at 4. *See Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.,* 94 F. Supp. 2d 589, 593 (E.D. Pa. 1999) (Pennsylvania law "generally honor[s] the intent of the contracting parties and enforce[s] the choice of law provisions in contracts executed by them.") (citations omitted).[9]

However, the parties disagree as to which law applies to the breach of oral contract claims and the Corporate Defendants' other Counterclaims.[10] At oral argument, the Corporate Defendants asserted that North Carolina law applies to the disposition of all of their Counterclaims.[11] The Rieders also suggest that North Carolina law is proper to analyze all claims in this action. ECF No. 60 at 15, 17-18. Plaintiff in his brief states that North Carolina law applies to "claims that fall within the scope of the Termination Agreement and its release

---

[8] The Court recognizes that this case is in the early stages of litigation, and therefore not all issues applicable to such an analysis may yet be evident. Thus, further choice of law analysis may be necessary as the claims and counterclaims are fleshed out in discovery.

[9] The Court finds that North Carolina bears a reasonable relationship to that contract, and vice-versa.

[10] "Contractual choice of law provisions . . . do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship." *Jiffy Lube Intern., Inc. v. Jify Lube of Pa., Inc.,* 848 F.Supp. 569 (E.D. Pa. 1994) (where provision was limited on its face to "this agreement" the contract did not contemplate to cover tort claims). Here, the Severance Agreement states that "[t]his Agreement shall be governed and interpreted in accordance with the laws of the State of North Carolina." ECF No. 11-1 at 3. Consequently, this clause cannot be applied to the other claims in this action that do not directly relate to, or flow from, the Severance Agreement.

[11] The Corporate Defendants are the only parties to advance a choice of law analysis in their response to Plaintiff's Motion to Dismiss Counterclaims. ECF No. 52 at 3-5. After applying Pennsylvania's choice-of-law analysis, the Corporate Defendants contend that North Carolina substantive law applies in all respects. *Id.* at 5.

provisions." ECF No. 46 at 4. Stillwagon asserted at oral argument that Pennsylvania law applied as to all other claims.[12]

Because Stillwagon concedes that all Counterclaims arising from the Severance Agreement are governed by the same substantive law, the Corporate Defendants' Counterclaim VI -- Fraud in the Inducement -- is also governed by North Carolina law.[13] Furthermore, the Corporate Defendants clarified in their brief that their Unfair and Deceptive Trade Practices Act Counterclaim is brought under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. ECF No. 52 at 27. Thus, the Court will also construe this claim under North Carolina law.

A federal court sitting in diversity must generally apply the choice-of-law rules of the forum state, here Pennsylvania. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Prior to *Griffith v. United Airlines, Inc.,* 203 A.2d 796 (Pa. 1964), Pennsylvania choice-of-law rules were the principles of *lex loci contractus* (place of contract) and *lex loci delicti* (place of injury). *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 227 (3d Cir. 2007). In *Griffith,* the Pennsylvania Supreme Court abandoned the strict *lex loci delicti* rule. *Griffith,* 203 A.2d at 806. While the

---

[12] Plaintiff, however, applies both North Carolina and Pennsylvania statutory and case law to Corporate Defendants' constructive fraud, breach of fiduciary duty, unjust enrichment, civil conspiracy, and unfair and deceptive trade practices claims. ECF No. 46.

[13] *See* Restatement (Second) Conflict of Laws § 187 which provides:
> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*See also Pa. Dept. of Banking v. NCAS of Del., LLC,* 948 A.2d 752, 758 (Pa. 2008) (adopting § 187). Because North Carolina has both a substantial relationship with the parties and the involved transactions, and is the state with the materially greater interest, its substantive law will apply to these claims.

Pennsylvania Supreme Court has not yet applied the *Griffith* standard to a contract action, the majority of Pennsylvania courts at both the state and federal level have applied the *Griffith* standard to contract actions. *Hammersmith*, 480 F.3d at 227-28.

Currently, Pennsylvania conflicts law combines a "governmental interest analysis" with the Restatement (Second) of Conflicts theory, thereby adopting a flexible "hybrid" approach. *Id.* at 230. The Pennsylvania choice-of-law analysis is thus a two-step process. "First, the Court must consider whether a 'false conflict' or a 'true conflict' exists between the competing policies and interests of the relevant states. Second, if there is a true conflict, the Court must decide 'which state has the greater interest in the application of its law.'" *Sherwin-Williams Co. v. Bei Enters., Inc.*, No. 2:12-CV-603, 2012 WL 5990313, at *3 (W.D. Pa. Nov. 30, 2012) (citations omitted).[14]

"A false conflict exists when only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law. A true conflict exists when the interests of each state would be impaired if the law of the other is given effect."[15] *Id.* However, "[i]f two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary." *Hammersmith*, 480 F.3d at 230. "Where the different laws do not produce different results, courts presume that the law of the forum state shall apply." *Fin.*

---

[14] Our Court of Appeals has reasoned that Pennsylvania choice of law analysis "employs depecage, the principle whereby different states' laws may apply to different issues in a single case." *Taylor v. Mooney Aircraft Corp.,* 265 Fed. App'x 87, 91 (3d Cir. 2008); *Conley ex rel. Estate of Kerr v. Ethex Corp.*, No. 10-1455, 2012 WL 32445 (W.D. Pa. Jan. 5, 2012) (same). Therefore, the Court must consider this when analyzing the law for various claims.

[15] In other words, a "false conflict is presented where an analysis of the policies or interests serving as the bases for the competing state laws results in a conclusion that the application of one state's law would not further the interests or policies of the other state's competing law and, additionally application of the other state's competing law would not adversely affect the interests or policies of the first state's law." *Wensley v. Scott*, 459 F. Supp. 2d 388, 392 (W.D. Pa. 2006). Put another way, "A false conflict occurs when, after examining the content and objectives of the laws of states A and B relating to the specific issues, it is found that only state A has an interest in the application of its law and that state B has no interest. It seems clear that the law of state B should not be applied if doing so will not advance any policy of that state and will defeat the policies of state A. In such a case, there is no reason for applying the law of state B except that some rule directs it in the (false) hope of achieving certainty." *Jagers v. Royal Indem. Co.*, 276 So. 2d 309, 311 (La. 1973).

*Software Sys., Inc. v. First Union Nat'l Bank*, No. 99-CV-623, 1999 WL 1241088, *3 (E.D. Pa. Dec. 16, 1999).

When a true conflict exists, the Court must then evaluate the interests of each state in the application of the respective laws. *Hammersmith*, 480 F.3d at 231 ("If a true conflict exists, the Court must then determine which state has the greater interest in the application of its law."). This analysis involves:

> a combination of the approaches of both [the] Restatement II (contacts establishing significant relationships) and interests analysis (qualitative appraisal of the relevant States' policies with respect to the controversy). This analysis requires more than a mere counting of contacts. Rather, we must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue.

*Id.* (citations and quotes omitted). The Restatement (Second) of Conflict of Laws informs the analysis by providing the factors relevant to the choice of the applicable rule of law:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971); *see Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005) (applying § 6).

## A.     **BREACH OF CONTRACT**

"The essential elements of a breach of contract claim are the same under Pennsylvania and North Carolina law." *Vurimindi v. Fuqua Sch. of Bus.*, 435 Fed. App'x 129, 132 (3d Cir. 2011); *Transure Servs., Inc. v. Brokerage Prof'ls, Inc.*, No. 06-CV-3306, 2007 WL 2253465, at *2 n.19 (E.D. Pa. Aug. 1, 2007). Thus, the oral breach of contract claims will be analyzed under the substantive law of the forum -- Pennsylvania law if the action remains here, North Carolina law if the action is transferred.

## B.   BREACH OF FIDUCIARY DUTY

### 1.   As an Officer or Director

Under Pennsylvania law, and in accordance with the "internal affairs doctrine", the applicable law that governs the liability of officers and directors of a company is the law of the jurisdiction of incorporation. *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 (3d Cir. 2005); *The Winer Family Trust v. Queen*, CIV.A. 03-4318, 2004 WL 2203709, at *24 (E.D. Pa. Sept. 27, 2004). As Rial is incorporated in North Carolina and Innsbrook is a limited liability company organized under the laws of North Carolina, North Carolina law applies to the breach of fiduciary duty Counterclaim related to Stillwagon's status as an officer and director.

### 2.   As an Attorney

With regard to a breach of fiduciary duty as an attorney, the Pennsylvania Rules of Civil Procedure require the filing of a Certificate of Merit "[i]n any action based upon an allegation that a licensed professional deviated from an acceptable professional standard." Pa. R. Civ. P. 1042.3(a); *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011) (holding that Pennsylvania Rule 1042.3 is substantive law and mandates the filing of a Certificate of Merit in federal court). However, North Carolina does not require the filing of a Certificate of Merit and the Corporate Defendants concede this. ECF No. 52 at 24. This issue presents a true conflict because Defendants have not filed a Certificate of Merit. Pennsylvania law would therefore dictate that this Counterclaim be dismissed, but the issue is not dispositive under North Carolina law. Thus, the Court must determine which forum has a stronger interest in the application of its laws in this regard.

Plaintiff is a licensed Pennsylvania attorney and, according to the Corporate Defendants, has never been licensed to practice law in North Carolina. ECF No. 51 at ¶ 279. Stillwagon also maintains a professional corporation, William C. Stillwagon, P.C., in Pennsylvania and drafted

the Severance Agreement in Pennsylvania. ECF No. 51 at ¶ 108; ECF No. 47 at ¶ 43. Pennsylvania has a strong interest in regulating the conduct of its attorneys and would subject Plaintiff to disciplinary action in this state. Consequently, Pennsylvania is the forum with a more "significant relationship," and therefore its law will apply to the Counterclaim alleging a breach of fiduciary duty by Stillwagon as an attorney.

### 3.   <u>As an Accountant</u>[16]

Under Pennsylvania law, "[a]n accountant is not automatically a fiduciary for his client." *Stainton v. Tarantino*, 637 F. Supp. 1051, 1066 (E.D. Pa. 1986). However,

> [a] fiduciary relationship exists where there is a relationship involving trust and confidence, and the proof must show confidence reposed by one side and domination and influence exercised by the other. It is not enough to show that the plaintiff reposed its trust in the defendant; the latter must also have accepted the fiduciary relationship. In determining whether a fiduciary relationship exists, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side. A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power.

*Leder v. Shinfeld*, 609 F. Supp. 2d 386, 401-02 (E.D. Pa. 2009) (citations and quotations omitted). *See also Stainton*, 637 F. Supp. at 1066 ("In business relationships, a confidential relationship arises only if parties surrender substantial control over some portion of their business affairs to another.").

The elements of breach of fiduciary duty are: "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bringing about plaintiff's

---

[16] Because Stillwagon is not a licensed accountant in either state, ECF No. 51 at ¶ 280, Pa. R. Civ. P 1042.3, which requires a Certificate of Merit, is inapplicable because that Rule applies only to "a licensed professional."

15

injuries." *Meyers v. Sudfeld*, No. 05-CV-2970, 2007 WL 419182, at \*10 (E.D. Pa. Feb. 2, 2007) (quoting *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998)).

Under North Carolina law, accountants do not automatically owe a fiduciary duty to their clients. *Harrold v. Dowd*, 561 S.E.2d 914, 919 (N.C. Ct. App. 2002) ("We have found no case stating that the relationship between accountant and client is *per se* fiduciary in nature.").[17] To sufficiently plead that a confidential or fiduciary relationship exists, one must "allege facts and circumstances (1) which created the relation of trust and confidence, and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Terry v. Terry*, 273 S.E.2d 674, 677 (N.C. 1981) (quoting *Rhodes v. Jones*, 61 S.E.2d 725 (N.C. 1950)).[18]

Under North Carolina law, "[t]he elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary relationship; (2) a breach of that duty; and (3) the wrongful action or inaction was the proximate cause of injury to the plaintiff." *Alcorn v. Bland*, No. COA12-613, 2012 WL 6591014, at \*3 (N.C. Ct. App. Dec. 18, 2012).

While the words explaining each state's law may differ, the Court does not find a material conflict between the substance of Pennsylvania and North Carolina law with regard to

---

[17] North Carolina recognizes two types of fiduciary relationships: "1) those that arise from 'legal relations such as attorney and client, broker and client . . . partners, principal and agent, trustee and cestui que trust,' and 2) those that exist 'as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'" *Frizzell Const. Co., Inc. v. First Citizens Bank & Trust Co.*, 759 F. Supp. 286, 290 (E.D.N.C. 1991) (quoting *Abbitt v. Gregory*, 160 S.E. 896, 906 (N.C. 1931)); *Dalton v. Camp*, 548 S.E.2d 704, 707-08 (N.C. 2001) (same).

[18] Similarly, principal-agent is a fiduciary relationship that arises upon two essential elements: "(1) [a]uthority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Colony Assocs. v. Fred L. Clapp & Co.*, 300 S.E.2d 37, 39 (N.C. Ct. App. 1983).

the fiduciary duties of non-licensed accountants as applied to this case. Therefore the law of the forum state will apply to this Counterclaim.[19]

## C.     GIST OF THE ACTION

Plaintiff argues that several of the Corporate Defendants' Counterclaims -- negligence, constructive fraud, actual fraud, civil conspiracy, negligent misrepresentation, misrepresentation, and conversion -- are barred by application of the Gist-of-the-Action doctrine. ECF No. 46 at 8-10. Pennsylvania law recognizes the Gist-of-the-Action doctrine, which provides that "when a tort claim involves actions arising from a contractual relationship, the plaintiff is generally limited to an action under the contract." *Grant Heilman Photography, Inc. v. John Wiley & Sons, Inc.*, No. 11-CV-01665, 2012 WL 1138615, at *6 (E.D. Pa. Mar. 30, 2012).[20]

> The gist-of-the-action doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract.

*Id.* On the other hand, North Carolina law does not recognize this doctrine, and Plaintiff does not cite to any case law to the contrary. *See also* ECF No. 52 at 5.

As there are substantive differences with regard to how these matters are resolved under Pennsylvania and North Carolina law, a true conflict exists. Thus, the Court must consider which state has the greater interest in application of its law.

The relevant contacts for actions in tort are enumerated in Restatement (Second) of Conflict of Laws § 145(2)(a)-(d), and include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality,

---

[19] For purposes of consideration of the Motion to Dismiss, Pennsylvania law will apply as "the law of the forum state" but the Court will also consider both Pennsylvania and North Carolina law in light of the Motion to Transfer. This same procedure will apply to other issues where "the law of the forum," as the case may be, applies.

[20] The Pennsylvania Superior Court has extended the application of this doctrine to include fraud claims relating to the performance of a contract. *Etoll, Inc. v. Elias / Savion Adver.*, 811 A.2d 10, 210-21 (Pa. Super. 2002).

place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Taylor v. Mooney Aircraft Corp.*, 265 Fed. App'x 87, 91 (3d Cir. 2008). In fraud or misrepresentation cases, the Court looks to the factors set forth in § 148 of Restatement (Second) of Conflict of Laws.[21] Under subsection (1) of § 148, when the "plaintiff's action in reliance took place in the state where the false representations were made and received," there is a presumption that the law of that state applies. Under subsection (2), when the plaintiff's action in reliance takes place in a different state than where the false representations were made and received, courts weigh the following factors:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

§ 148(2). *See Coram*, 94 F. Supp. 2d at 594; *Maniscalco v. Brother Int'l (USA) Corp.*, No. 11-3032, 2013 WL 856379, at *3-6 (3d Cir. Jan. 16, 2013).

Plaintiff is a resident of Pennsylvania, the Rieders are residents of Austria, and the Corporate Defendants are businesses established under the laws of and located in North Carolina. While each forum has an interest in protecting its citizens or remedying its citizen's injuries, the relationship of the parties here centers on North Carolina. While Plaintiff may have performed a substantial amount of his work from his office in Pennsylvania, he contracted to perform in

---

[21] According to the pleadings, Stillwagon drew up the Severance Agreement in Pennsylvania and Alois Rieder signed it in Austria. ECF No. 47 at ¶¶ 43-46. The Corporate Defendants do not specifically allege where each fraudulent statement and misrepresentation in the years prior to the Severance Agreement were made or received, but it appears that Plaintiff made representations in both North Carolina and Pennsylvania, and that those representations were received in either North Carolina or Austria. The Court will therefore consider the § 148(2) factors.

North Carolina. Stillwagon directed his services towards North Carolina, his remuneration depended on business within that state, and the claims involve business relationships and property sales that occurred within North Carolina. The Corporate Defendants' plead that Stillwagon acted in North Carolina by conspiring with other North Carolina entities and people, improperly transferring North Carolina property, manipulating construction bidding processes, and altering company documents all within North Carolina, which ultimately resulted in injury to the Corporate Defendants' in North Carolina. Thus, North Carolina has a stronger governmental interest and connection to the tort counterclaims that the Gist of the Action doctrine is alleged to bar. Accordingly, North Carolina law properly governs disposition of this issue.

### D.    ECONOMIC LOSS DOCTRINE

Plaintiff also argues that the Corporate Defendants' tort and unfair trade practice Counterclaims are barred by the economic loss doctrine. ECF No. 46 at 10. Under Pennsylvania law, "[t]he Economic Loss Doctrine provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir. 2008) (quoting *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)).

The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). The economic loss doctrine serves to maintain the separation between the law of contract and the law of tort. *N.Y. State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super. Ct. 1989); *Sun Co., Inc. (R & M) v. Badger Design & Constructors, Inc.*, 939 F. Supp. 365, 372 (E.D. Pa. 1996) (applying economic loss doctrine to service contracts); *Kearney v. JPC Equestrian, Inc.*, No. 3:11-CV-01419, 2012 WL 1020276 (M.D. Pa. Jan. 4, 2012), *report & recommendation adopted* No. 3:11-CV-01419,

2012 WL 1020266 (M.D. Pa. Mar. 26, 2012) (economic loss doctrine appears to apply to employment contracts).

While the Pennsylvania Supreme Court has not yet addressed whether the economic loss doctrine applies to claims for intentional fraud, the Third Circuit has held that the economic loss doctrine applies to claims for negligence, negligent misrepresentation, and intentional fraud. *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002).[22]

North Carolina's economic loss rule limits a contracting party's ability to recover in tort and, in general, provides that a breach of contract claim will not support the assertion of tort claims as well. *Silicon Knights, Inc. v. Epic Games, Inc.*, 5:07-CV-275-D, 2011 WL 1134453, at *4 (E.D.N.C. Jan. 25, 2011), *report & recommendation adopted*, 5:07-CV-275-D, 2011 WL 1134447 (E.D.N.C. Mar. 24, 2011).

However, under North Carolina law the economic loss doctrine does not apply to situations involving intentional fraud or willful acts. *Kelly v. Ga.-Pac. LLC*, 671 F. Supp. 2d 785, 791 n.2 (E.D.N.C. 2009) (quoting *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 350 (N.C. 1978)) (the economic loss rule is precluded where "[t]he injury so caused was a willful injury to or a conversion of the property of the promisee" or where "[t]he injury,

---

[22] Some courts have refused to apply *Werwinski* and have held that the economic loss doctrine does not apply to intentional torts. *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 275 (E.D. Pa. 2003) ("We cannot follow the panel's decision when it is not in harmony with Pennsylvania state law . . . Pennsylvania's economic loss doctrine is inapplicable to intentional torts."); *Oppenheimer v. York Int'l*, No. 4348 MARCHTERM 2002, 2002 WL 31409949, at *2 (Pa. Com. Pl. Oct. 25, 2002) ("this Court has not extended the economic loss doctrine to cover intentional torts."); *Smith v. Reinhart Ford*, 68 Pa. D. & C.4th 432, 437 (Pa. Ct. Com. Pl. 2004) (citation omitted) ("[I]t does not make sense to extend the doctrine to intentional torts taken by one party to subvert the purpose of a contract.").

However, while noting this discord, other federal district courts continue to apply *Werwinski*. "Neither the Pennsylvania Supreme Court nor any Superior Court has determined whether the economic loss doctrine applies to intentional fraud or misrepresentation claims. . . . The lower Pennsylvania courts have, as far as we can tell, unanimously ruled that such claims are not barred by the economic loss doctrine." *Air Products & Chemicals, Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 335 (E.D. Pa. 2003) (bound by *Werwinski*); *DeFebo v. Andersen Windows, Inc.*, 654 F. Supp. 2d 285, 294 (E.D. Pa. 2009) (noting controversy, but holding that court is bound by *Werwinski*); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 386 (D.N.J. 2004) (applying *Werwinski*). Until the Pennsylvania Supreme Court conclusively addresses this issue, or the Third Circuit *en banc* overrules *Werwinski*, this Court is bound by that decision.

proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promise.").

Because the Corporate Defendants plead that Stillwagon intended to commit these torts, and that his actions were willful, there are substantive differences with regard to how this matter is resolved under Pennsylvania and North Carolina law, and a true conflict exists.

The analysis as to the forum with the greatest interest with respect to this issue is identical to the analysis applied as to the gist of the action doctrine. Thus, North Carolina is the forum with the greatest interest and its law applies to the economic loss rule issue.

E.    **UNJUST ENRICHMENT**

Under the law of both Pennsylvania and North Carolina, a claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties. *See Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) ("[The doctrine of unjust enrichment] applies only to situations where there is no legal contract.") (citation omitted); *Homziak v. Gen. Elec. Capital Warranty Corp.*, No. GD2000-1707, 2001 WL 35923945 (Pa. Ct. Com. Pl. May 21, 2001) (dismissing unjust enrichment claim where Plaintiff failed to adequately plead the absence of a valid written contract, stating that Plaintiff "[did] not plead facts on which this Court could conclude that the service contract is [unenforceable as] insurance"). *Cf. Se. Shelter Corp. v. BTU, Inc.*, 572 S.E.2d 200, 206 (N.C. Ct. App. 2002) ("If there is a contract between the parties, the contract governs the claim and the law will not imply a contract."); *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005) (same).

As there is no conflict between the two states' laws, the unjust enrichment claims will be analyzed under the substantive law of the forum.

## F.    CONVERSION

Under Pennsylvania law, the required elements of a conversion claim are: "[(1)] the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, [(2)] without the owner's consent, and [(3)] without lawful justification." *Vavro v. Albers*, No. 2:05CV321, 2006 WL 2547350, at *13-14 (W.D. Pa. Aug. 31, 2006) (quoting *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000)). "As to the type of property that may be the subject of conversion, it is clear in Pennsylvania that a cause of action for conversion may be maintained for almost all kinds of personal property, including money, notes, bonds, certificates of stock, title deeds." *Id.* at *14.

Under North Carolina law, the tort of "[c]onversion is defined as: (1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owner." *Day v. Rasmussen*, 629 S.E.2d 912, 914 (N.C. Ct. App. 2006) (citation omitted). Moreover, misappropriated funds may be the subject of a claim for conversion. *Gadson v. Toney*, 316 S.E.2d 320, 322 (N.C. Ct. App. 1984).

The Court finds that there is no material conflict as to the elements required to sufficiently plead a cause of action for conversion. Thus, a choice of law analysis is not necessary, and the law of the forum will apply.

## G.    CIVIL CONSPIRACY

Under Pennsylvania law, the essential elements for a claim of civil conspiracy are: "1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." *Kist v. Fatula*, No. 32006-67, 2007 WL 2404721, at *9 (W.D. Pa. Aug. 17, 2007) (citations and quotations omitted); *Cranberry*

*Promenade, Inc. v. Cranberry Twp.*, CIV. A. 09-1242, 2010 WL 653915, at *6 (W.D. Pa. Feb. 22, 2010) (same).

"Proof of agreement and malicious intent are essential to stating a claim for conspiracy, and the fact that two or more people are acting to do something at the same time is not by itself an actionable conspiracy. It should also be noted that in Pennsylvania, a claim for civil conspiracy cannot be plead without alleging an underlying tort." *Kist*, 2007 WL 2404721, at *9 (citations and quotations omitted). *See also Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F. Supp. 2d 684, 701 (W.D. Pa. 2003) (citing *Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466, 472 (Pa. 1979)) ("Furthermore, plaintiffs are required to allege and prove malice—that is, an unlawful intent to injure absent justification."). Finally, "[i]n order for one member of a civil conspiracy to be liable, not all members of the conspiracy need be named as defendants or joined as defendants." *U.S. Investigations Servs., LLC v. Callihan*, No. 2:11-CV-00355, 2012 WL 933069, at *2 (W.D. Pa. Mar. 19, 2012).

Under North Carolina law, the elements for a civil conspiracy claim are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Bon Aqua Int'l, Inc. v. Second Earth, Inc.*, No. 1:10CV169, 2013 WL 357469, at *22 (M.D.N.C. Jan. 29, 2013) (quoting *Strickland v. Hedrick*, 669 S.E.2d 61, 72 (N.C. Ct. App. 2008)). "Conspiracy requires an intent to do a *wrongful* act, such as an intentional tort." *Suntrust Mortg., Inc. v. Busby*, 651 F. Supp. 2d 472, 488 (W.D.N.C. 2009).

Furthermore, in North Carolina, a civil conspiracy claim requires a viable underlying predicate claim, as it is not a separate civil action but is premised on the underlying act. *Id.* ("a 'naked claim' of civil conspiracy cannot be brought independent of properly-alleged claims for

the underlying wrongdoing, making such claim subject to dismissal if the underlying claims for wrongful conduct are dismissed."); *Outer Banks Beach Club Ass'n, Inc. v. Festiva Resorts Adventure Club Member's Ass'n, Inc.*, No. 1:11CV246, 2012 WL 4321324, at *5 (W.D.N.C. June 18, 2012) (recognizing civil conspiracy to commit fraud); *Pedwell v. First Union Nat. Bank of N.C.*, 275 S.E.2d 565, 567 (N.C. Ct. App. 1981) (breach of contract as overt act). Finally, "[a]ll conspirators may be joined as parties defendant in an action for the damages caused by their wrongful act, although it is not necessary that all be joined; an action may be maintained against only one." *Burns v. Gulf Oil Corp.*, 98 S.E.2d 339, 344 (N.C. 1957) (quoting 11 Am. Jur., Conspiracy § 54).

Application of either state's law would lead to the same end result, and the Court finds that there is not a material conflict between Pennsylvania and North Carolina law. The law of the forum state will therefore apply to this claim.

## IV. MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(7)

Plaintiff first argues that Counts IV, VI, IX, and XI of the Counterclaims should be dismissed for a failure to join necessary and indispensable parties under Federal Rule of Civil Procedure 19. He argues that *all* parties to a contract are indispensable in an action to rescind a contract, and therefore the Counterclaims that seek, in intent or effect, to rescind the Severance Agreement should be dismissed because they fail to do so. ECF No. 46 at 5-7.

The following persons and entities were parties to the Severance Agreement: Stillwagon, the Rieders, Rial, Innsbrook, Seg Anstalt, Nufin Anstalt, Watersprings Development[23], and All Seasons. ECF No. 11-1. The Corporate Defendants point out that All Seasons has been

---

[23] The Severance Agreement lists this entity as "Watersprings Development" but the Corporate Defendants, in their Answer, list the entity as "Water Springs Development." Because the Severance Agreement's validity is at issue, the Court will refer to the entity as "Watersprings Development" or "Watersprings."

dissolved, ECF No. 52-1. Stillwagon, the Rieders[24], Rial, and Innsbrook are all parties to this litigation. Thus, the parties to the Severance Agreement that are not a party to this action are Seg Anstalt, Nufin Anstalt, and Watersprings.[25]

Federal Rule of Civil Procedure 19 specifies the circumstances in which the joinder of a party is compulsory. To decide whether joinder of a party is required, a court must first determine whether the absent party is a necessary party. *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993); *see also Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007) ("we must first determine whether the absent insurers should be joined as 'necessary' parties under Rule 19(a)"). If the party should be joined, but their joinder is not feasible, the court must then decide whether the absent party is indispensable under Rule 19(b). *Id.* If the absent party is indispensable, the action cannot go forward. *Id.* If however, the absent party is not necessary in the first instance, the court need not reach the question of whether that party is indispensable. *Id.*

Rule 19(a) defines the parties who are "necessary" in the sense that their joinder is compulsory "if feasible." It states, in pertinent part:

> A person . . . shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

---

[24] Plaintiff originally argued in his brief that the Rieders had not yet been served, however, this has been remedied as service has since been accepted by Alois and Richard Rieder. ECF No. 50.

[25] Watersprings is purportedly the sole shareholder of Rial, and Rial is the sole member of Innsbrook. ECF No. 51 at ¶ 10.

Fed. R. Civ. P. 19(a). Because the Rule is phrased in the disjunctive, if a party's absence results in any of the problems identified in either subsections (a)(1) or (a)(2), then the absent party's joinder is compulsory if feasible. *Janney*, 11 F.3d at 405.

Thus, the Court first asks whether complete relief can be accorded to the parties to an action when all parties to a contract at issue have not been joined as defendants. While the Court may be able to afford Plaintiff relief under a joint and several liability theory on his affirmative breach of contract claims as to some but not all opposing contracting parties, if Defendants are found liable under the Severance Agreement, *id.* at 405-406, Defendants seek rescission or to void the Severance Agreement, which requires that all signatories to the contract be joined. *Shields v. Barrow*, 58 U.S. 130, 140 (1854) ("For, if only a part of those interested in the contract are before the court, a decree of rescission must either destroy the rights of those who are absent, or leave the contract in full force as respects them; while it is set aside, and the contracting parties restored to their former condition, as to the others. We do not say that no case can arise in which this may be done; but it must be a case in which the rights of those before the court are completely separable from the rights of those absent, otherwise the latter are indispensable parties."); *Rosenzweig v. Brunswick Corp.*, No. 08-807 (SDW), 2008 WL 3895485, at *6 (D.N.J. Aug. 20, 2008) (court unable to afford complete relief where rescission/reformation of contract sought and signatory of contract was an absent party); *Derry Fin. N.V. v. Christiana Cos., Inc.*, 102 F.R.D. 892, 895 (D. Del. 1984) ("Courts have long recognized that all parties to a contract should be before the Court if rescission is sought."); *In re Olympic Mills Corp.*, 477 F.3d 1, 10 (1st Cir. 2007) ("co-obligors generally are not indispensable parties in contract disputes that do not involve reformation, cancellation, rescission, or otherwise challenge the validity of the contract.").

Moreover, voiding the Severance Agreement in the context of only the parties in this case would leave Stillwagon with a substantial risk of inconsistent obligations because he would still be in a contractual relationship with Seg Anstalt, Nufin Anstalt, and Watersprings, since under the Severance Agreement, Plaintiff agreed to release all of the signatories of any liability once the installment payments are paid. ECF No. 11-1 at 1-2. *See Wheaton v. Diversified Energy, LLC*, 215 F.R.D. 487, 491 (E.D. Pa. 2003) (recognizing that a contract's "cancellation or rescission" may lead to inconsistent obligations).

Consequently, Seg Anstalt, Nufin Anstalt, and Watersprings Development are at least necessary parties and must be joined if feasible as to these Counterclaims. Fed. R. Civ. P. 19(a)(2). Counterclaim Counts IV, VI, IX, and XI are therefore dismissed without prejudice to their reassertion once the complete Rule 19 necessary / indispensable party joinder process plays out.

## V. <u>MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u>

The Court must next consider Plaintiff's Motion to Dismiss Counterclaims pursuant to Fed. R. Civ. P. 12(b)(6). The Court will apply the appropriate substantive law as to each as discussed above in the choice-of-law analysis. For those claims in which "the law of the forum state" will apply, the Court will consider the law of both Pennsylvania and North Carolina.

### A. <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), an answer with counterclaims, as is the case with a complaint, *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 524 (W.D. Pa. 2011), must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

> While a [counterclaim] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [counter-claimant's] obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and

27

a formulaic recitation of the elements of a cause of action will not do. Factual
allegations must be enough to raise a right to relief above the speculative level.

*Id.* at 555 (internal citations omitted). Courts are not "bound to accept as true a legal conclusion
couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Furthermore,
"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory
statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The Court must accept
as true all allegations in the complaint (here, the Counterclaims) and all reasonable inferences are
drawn in favor of the non-movant. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637
F.3d 435, 440 (4th Cir. 2011); *Rocks v. City of Phila.,* 868 F.2d 644, 645 (3d Cir. 1989).

Further, when pleading fraud, special rules come into play. Rule 9(b) of the Federal
Rules of Civil Procedure provides "[i]n all averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and
other condition[s] of mind of a person may be averred generally." *See also Ahmed v. Porter,* No.
1:09CV101, 2009 WL 2581615, at *7-8 (W.D.N.C. June 23, 2009) ("The specificity required in
claiming fraud is an exception to the provisions of notice pleading found in" Rule 8.).

## B.   DISCUSSION

### 1.   Gist of the Action Doctrine

Plaintiff argues that the Corporate Defendants' tort Counterclaims -- Count III for civil
conspiracy, Count IV for constructive fraud[26], Count V for actual fraud, misrepresentation, and
negligent misrepresentation, Count VII for negligence, and Count X for conversion -- are barred
by the Gist of the Action doctrine. As discussed above, North Carolina law applies to this issue
and it does not recognize the Gist of the Action Doctrine. Thus, Plaintiff's argument here fails
and the Motion to Dismiss these Counts of the Counterclaim is denied.

---

[26] Counterclaim Count IV has been dismissed for failure to join a party and therefore the Court need not address the
Gist of the Action doctrine or Economic Loss rule with respect to this Counterclaim.

## 2. **Economic Loss Rule**

As discussed above, North Carolina law applies to this issue and it does recognize the economic loss rule. *N. C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 350 (N.C. 1978) *rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.,* 328 S.E.2d 274 (N.C. 1985) ("Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor."). Thus,

> [u]nder the rule, in order to assert a tort and breach of contract claim arising from the same conduct, a plaintiff must allege a duty owed by the defendant that is separate and distinct from duties owed pursuant to the contract. . . . Not only must the tort constitute an identifiable, independent tort, . . . but the tort also must have an aggravating element, such as fraud, malice, reckless indifference, oppression, insult, and willfulness. . . . The policy behind the independent tort exception is to keep open-ended tort damages from distorting contractual relations in light of the fundamental difference between tort and contract claims. . . . Courts only allow tort causes of action if contract theory is insufficient to cover the facts.

*Silicon Knights*, 2011 WL 1134453, at *5.

However, the economic loss rule does not apply in the absence of a contract between the parties. *Lord v. Customized Consulting Specialty, Inc.,* 643 S.E.2d 28, 29 (N.C. Ct. App. 2007). Moreover, North Carolina courts have generally not extended the economic loss rule to claims of fraud and negligent misrepresentation. *Silicon Knights*, 2011 WL 1134453, at *5 (listing cases).[27]

Furthermore, according to the North Carolina Supreme Court, there are four scenarios in which the application of the economic loss rule is precluded. Two of these four scenarios include situations in which "[t]he injury so caused was a wilful injury to or a conversion of the property of the promise, which was the subject of the contract, by the promisor . . . " or where

---

[27] *Club Car, Inc. v. Dow Chem. Co.*, No. 06 CVS 15530, 2007 WL 2570088, at *4 (N.C. Super. May 3, 2007) ("The North Carolina appellate courts have yet to extend the application of the economic loss doctrine to bar claims based on fraud."); *Wilson v. Dryvit Sys., Inc.,* 206 F. Supp. 2d 749, 754–55 (E.D.N.C. 2002) (holding that economic loss rule did not extend to claims for negligent misrepresentation).

"[t]he injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promise . . ." *N.C. State Ports*, 240 S.E.2d at 350.

Because the validity of both written and oral contracts are at issue in this litigation (both as to Plaintiff's claims and the various Counterclaims), dismissing these Counterclaims on the basis that a contractual remedy exists would be premature. *Lord*, 643 S.E.2d at 29 ("the economic loss rule does not operate to bar a negligence claim in the absence of a contract between the parties."); *DeBlaker v. MI Windows & Doors, Inc.*, 3:10CV427, 2011 WL 1135551, at *1 (W.D.N.C. Mar. 24, 2011) (same). Similarly, as to any Counterclaim for fraud in the inducement, such allegations are grounded in Plaintiff's conduct prior to executing an agreement and therefore do not arise from a contract.

North Carolina courts have generally not extended the economic loss rule to claims of fraud and negligent misrepresentation. *Silicon Knights*, 2011 WL 1134453, at *5 (listing cases). Thus, the Motion to Dismiss Counterclaims for fraud and negligent misrepresentation in Count V on the basis of the economic loss rule must be denied.

Assuming a contract exists, application of the economic loss rule is precluded in those situations in which the "injury so caused was a willful injury or a conversion of the property," or in which the injury was to property not subject to a contract and was caused by a negligent or willful act or omission. *Id.* at 6, n.7. Not only was the misconduct of Plaintiff complained of by the Corporate Defendants beyond the scope of the alleged oral agreements for the development of properties in North Carolina, but also the Corporate Defendants plead that Plaintiff took these actions with the express purpose and intent to improperly convert funds and property. Thus, the

Counterclaims for conversion, breach of fiduciary duty, civil conspiracy, and unfair trade practice (Counts I, III, VIII, and X) each fit within at least one of the exceptions to the application of the economic loss rule.

Furthermore, the Corporate Defendants allege that Stillwagon owed to them a duty "separate and distinct" from the Severance Agreement and any oral contract for a land development project. For instance, they say that Plaintiff owed them a fiduciary duty as a company officer and director, and that such a party owes a duty to not provide false information to induce a contract. *Kindred of N. Carolina, Inc. v. Bond*, 584 S.E.2d 846, 853 (N.C. Ct. App. 2003). The Corporate Defendants have also sufficiently plead aggravating elements (fraud, malice, and willfulness) to be an independent tort, taking this outside of the economic loss rule. *Silicon Knights*, 2011 WL 1134453, at *5. The Court concludes that these allegations go beyond Plaintiff simply failing to perform under the contract and, therefore, the economic loss rule does not bar Counts I or V.

This leaves the claim for negligence in Counterclaim Count VII. The Corporate Defendants allege that Plaintiff "was negligent in advising the Defendants and performing his duties in a manner inconsistent with the Defendants' needs, objectives, and express wishes, and in making representations about the Project that were false or made with reckless disregard for the truth of the representations." ECF No. 51 at ¶ 276. However, these duties necessarily arose (if at all) from the alleged oral contracts, and therefore cannot be considered "separate and distinct" from duties owed pursuant to a contract. Thus, if there is no contract, there are no such duties; if there is a contract, the economic loss rule would bar the Corporate Defendants' Counterclaim for negligence. The Motion to Dismiss Count VII of the Counterclaim is therefore granted with prejudice.

31

### 3. Failure to State a Claim for Breach of Fiduciary Duty

Plaintiff also argues that the Corporate Defendants' non-fraud based breach of fiduciary duty claim must fail because the Severance Agreement released Stillwagon from "any and all claims." Severance Agreement at ¶ 3.[28] However, the Corporate Defendants argue that the Severance Agreement (and therefore the release contained in it) is void and/or unenforceable. Thus, this argument is premature as the validity of the Severance Agreement must first be adjudicated.

Plaintiff continues, however, by arguing that this Counterclaim should nonetheless be dismissed because Stillwagon did not have a legal duty to conduct competitive bidding for projects, Defendants were not injured by the use of an un-licensed general contractor, that there is "nothing *per se* improper" about companies sharing personnel and materials, Plaintiff never held himself out to Defendants as an attorney or accountant, and finally, that the Corporate Defendants failed to file a Certificate of Merit. ECF No. 46 at 13-16. These concepts each require closer examination.

### a. Fiduciary Duty as an Attorney

Pennsylvania law applies to the claim for breach of fiduciary duty as an attorney. Pennsylvania courts have held that an attorney owes a fiduciary duty to his client. *See Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1283 (Pa. 1992) (an attorney owes a fiduciary duty to his client which "demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable."); *Capital Care Corp. v. Hunt*, 847 A.2d 75, 84 (Pa. Super. 2004) ("It is axiomatic that an attorney who undertakes representation of a client owes that client both a duty of competent representation and the highest

---

[28] The referenced clause in the Severance Agreement releases Stillwagon from all claims except for "embezzlement or any other fraudulent acts." Severance Agreement ¶ 3. Assuming this clause is valid and enforceable, then presumably any theft-like or fraud-based claims are still on the table for the Defendants.

duty of honesty, fidelity, and confidentiality."). However, because the Corporate Defendants have not filed a Certificate of Merit under Pa. R. Civ. P. 1043.2, Count I with respect to a breach of fiduciary duty as an attorney is dismissed without prejudice. *See Walsh v. Consol. Design & Eng'g, Inc.*, No. 05-2001, 2007 WL 2844829, at *8 (E.D. Pa. Sept. 28, 2007) (requiring a Certificate of Merit for attorney breach of fiduciary duty claim).

## b.  **Fiduciary Duty as an Officer or Director**

As discussed above, the law of North Carolina applies to a breach of fiduciary duty claim as to Stillwagon's service as an officer and director. "Under North Carolina law, directors of a corporation generally owe a fiduciary duty to the corporation . . . ." *Green v. Freeman*, 733 S.E.2d 542, 550 (N.C. Ct. App. 2012) (citations and quotations omitted). The North Carolina Supreme Court defined part of that duty:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

*Meiselman v. Meiselman*, 307 S.E.2d 551, 568 (N.C. 1983) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).

Because the Corporate Defendants plead that Stillwagon was president, vice president, and a director of their companies[29], and Stillwagon admits as much[30], there is a reasonable

---

[29] ECF No. 51 at ¶¶ 113, 115, 127, 176.

inference that a corporate fiduciary relationship existed between the parties. The Corporate Defendants then go on to allege that Plaintiff intentionally took actions that were injurious to the corporations in his role as a company officer and director. ECF No. 51 at ¶ 149. Some of the alleged actions include improper handling of the companies' finances, *id.* at ¶¶ 157-61, manipulating the bidding process, *id.* at ¶¶ 153, 207-17, violating North Carolina law, *id.* at ¶ 149, allowing entities to double charge Defendants, *id.* at ¶¶ 154, 197, paying the same charge to two companies, *id.* at ¶ 163, paying invoices for incomplete work without a reasonable investigation or intentionally overpaying subcontractors, *id.* at ¶¶ 187-88, 198, 202-06, 229, paying himself and others excessive commissions, *id.* at ¶¶ 164, 178, and improperly deeding from the companies to himself and others titles to land. *Id.* at ¶¶ 190-91. If established, it is more than plausible that these allegations would amount to a breach of a fiduciary duty. This is particularly true because Defendants plead that Stillwagon took these actions for personal gain at the expense of the companies of which he served as an officer and director. Furthermore, because the Corporate Defendants allege that Stillwagon himself took these actions, there is a reasonable inference that the breach of Stillwagon's fiduciary duty was a proximate cause of the companies' injury. Therefore, the Motion to Dismiss Count I of the Counterclaim with regard to Stillwagon's role as an officer or director is denied.

### c.     **Fiduciary Duty as an Accountant**

Because neither Pennsylvania nor North Carolina law considers accountants to be fiduciaries *per se*, the Corporate Defendants must plead sufficient facts to establish that the relationship between Stillwagon and the companies was one of a "special trust and confidence." The Corporate Defendants allege that Stillwagon was in part employed as an accountant in order to render accounting services. ECF No. 51 at ¶¶ 160, 234. They also plead that Stillwagon

---

[30] ECF No. 46 at 16, 25.

sought out and paid himself compensation for his work in providing accounting services. *Id.* at ¶¶ 144, 146. The Corporate Defendants assert that Plaintiff had primary control over the companies' financial accounting, that Stillwagon was in such a high position that he controlled the process for the financial audits (which included hand selecting who worked on the company's financial statements), *id.* at ¶¶ 157, 158, was able to maintain corporate bank accounts for which he did not obtain approval from the Board of Directors, *id.* at ¶ 140, and as he was the sole signatory for some of these accounts Defendants were unable to obtain bank statements for these accounts for their own records. *Id.* at ¶ 226. These allegations adequately establish that Stillwagon "occupied positions of trust, confidence, and fiduciary responsibility", *id.* at ¶ 234, sought and accepted this position of trust to perform accounting services, and maintained substantial control of the company finances.

The Corporate Defendants also sufficiently plead that Stillwagon breached this duty by taking advantage of his position of trust, which resulted in injury to Defendants. For instance, Defendants allege that Stillwagon rebuffed directives to obtain independent audits, *id.* at ¶¶ 157, 158, employed staff who lacked any accounting experience to help perform accounting services, *id.* at ¶ 160, made improper payments from the companies to himself and others, *id.* at ¶¶ 161, 178, 187, and manipulated financial statements given to Defendants. *Id.* at 184. The Corporate Defendants allege that this bookkeeping chicanery amounted to a loss to the companies of over $4 million in capital that Plaintiff was unable to explain. *Id.* at ¶ 158.

Overall, the Corporate Defendants allege that they relied upon Stillwagon's false representations as to the general and financial state of affairs of the business provided by Stillwagon in his capacity as an officer, director, and accountant, that in carrying out his duties while in these positions he improperly paid himself and others, manipulated financial records and

business processes to cover his scheme and, consequently, these breaches of fiduciary duty resulted in millions of dollars of capital and asset losses to the Corporate Defendants. On the basis of these allegations, the Court concludes that Count I sufficiently alleges a breach of fiduciary duty as an accountant to withstand the Motion to Dismiss.

### 4. **Failure to State a Claim for Unjust Enrichment**

Under the law of both Pennsylvania and North Carolina, as discussed above, a claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties. In their Counterclaims, the Corporate Defendants allege that oral contracts exist and fail to plead, in the alternative, the absence of any valid written or oral contract.[31] The Motion to Dismiss Count II of the Counterclaim with regard to a claim for unjust enrichment is therefore granted.

### 5. **Failure to State a Claim for Civil Conspiracy**

Plaintiff goes on to argue that the Corporate Defendants' Counterclaim for civil conspiracy (Count III) should be dismissed because North Carolina and Pennsylvania courts have held that civil conspiracy is not independently actionable, Defendants failed to plead malice, and Defendants failed to join the other alleged conspirators. ECF No. 46 at 17-18.

First, North Carolina and Pennsylvania law both recognize a cause of action for civil conspiracy where the claim is alleged alongside an underlying tort or predicate claim.

Secondly, Pennsylvania law requires a party to plead malice, or an intent to injure. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). The Corporate Defendants have alleged that Plaintiffs took actions in order to benefit himself and the other conspirators

---

[31] *See XL Enter. v. Cendant Mobility Servs. Corp.*, No. 99-3186, 1999 WL 1157622 (E.D. Pa. Dec. 14, 1999) (recognizing that when a contractual relationship exists between the parties, including even an oral contract, that there is no basis for an unjust enrichment claim); *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) ("By its nature, the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists.").

through wrongful conduct at the expense of the businesses. The natural consequence of these actions is to intentionally injure the companies. Third, as discussed above, neither Pennsylvania nor North Carolina require that a party name or join all co-conspirators in the action.

The Corporate Defendants' Counterclaims sufficiently allege an agreement between two or more individuals to do an unlawful act or a lawful act in an unlawful way pursuant to a common scheme. These are hallmark allegations of malice. Moreover, the Counterclaim clearly articulates underlying, overt, acts at the heart of the alleged conspiracy, pleading conversion, breach of contract, and other fraud-related claims. The Motion to Dismiss Count III of the Counterclaim is therefore denied.

### 6. Failure to State a Claim for Unfair and Deceptive Trade Practices

Stillwagon argues that this Counterclaim should be dismissed because the Corporate Defendants fail to identify the applicable statute in Count VIII of the Counterclaim, and that in any event the purpose of such an act is to protect consumers and the general public. As discussed above, the Corporate Defendants clarified this issue in their response brief, and the Unfair and Deceptive Trade Practices Act ("UDTPA") Counterclaim is brought under the North Carolina statute, N.C. Gen. Stat. § 75-1.1. ECF No. 52 at 27.

Under North Carolina's UDTPA, a party must plead: "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) proximately causing actual injury to plaintiff or plaintiff's business." *Bon Aqua Int'l, Inc. v. Second Earth, Inc.*, No. 1:10CV169, 2013 WL 357469, at *20 (M.D.N.C. Jan. 29, 2013) (citations omitted); *Lawrence v. UMLIC-Five Corp.*, No. 06 CVS 20643, 2007 WL 2570256, at *5 (N.C. Super. Ct., June 18, 2007). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Bon Aqua*, 2013 WL 357469, at *20 (quoting *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987)).

37

The UDTPA defines "commerce" broadly, to include "all business activities, however denominated", but not "professional services rendered by a member of a learned profession." N.C. Gen.Stat. § 75-1.1(b). "Courts apply a two-part test when considering the UDTPA's learned profession exemption. 'First, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services.'" *Battleground Veterinary Hosp., P.C. v. McGeough*, No. 05 CVS 18918, 2007 WL 3071618, at *7 (N.C. Super. Oct. 19, 2007) (quoting *Reid v. Ayers*, 531 S.E.2d 231, 235 (N.C. Ct. App. 2000)). The "crucial inquiry [is] whether the [particular function or conduct is] a necessary part of the [professional] services provided." *Id.* (alterations in the original). Thus, Stillwagon's actions taken in his capacity as an attorney are barred from consideration when analyzing this claim. Moreover, "proof of an independent tort generally is sufficient to make out make out a separate UDTPA claim." *Id.*; *Sara Lee Corp. v. Carter*, 519 S.E.2d 308, 311-12 (N.C. 1999) (finding that the breach of a fiduciary duty by an employee also gave rise to a UDTPA claim).

Plaintiff argues that this unfair practices legislation is designed to protect consumers and thus this Counterclaim should be dismissed as it is alleged here only by businesses. While Pennsylvania's Unfair Trade Practices and Consumer Protection law is designed to protect unsophisticated consumers and does not list businesses as being able to bring a private action under the act, 73 Pa. Stat. § 201-9.2, North Carolina law allows for a private UDTPA action to be maintained by a business. *See Fin. Software Sys., Inc. v. First Union Nat. Bank*, No. 99-CV-623, 1999 WL 1241088, at *5 (E.D. Pa. Dec. 16, 1999). *See* N.C. Gen. Stat. § 75-16 (2012) ("If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation

in violation of the provisions of this Chapter, *such person, firm or corporation so injured shall have a right of action* on account of such injury done . . .") (emphasis added); *Concrete Serv. Corp. v. Investors Grp., Inc.*, 340 S.E.2d 755, 760 (N.C. Ct. App. 1986) ("The statutes do not protect only individual consumers, but serve to protect businesspersons as well.").

The Corporate Defendants sufficiently allege a UDTPA claim. They allege unfair and deceptive acts under circumstances that, if true, are reasonably considered "egregious or aggravating." *Ellis v. La.-Pac. Corp.*, 699 F.3d 778, 787 (4th Cir. 2012). Also, because the Corporate Defendants have sufficiently pled that Stillwagon's actions amounted to fraud, there is a reasonable inference that Plaintiff's actions were "unfair or deceptive." Plaintiff's actions involved contractors and the purchase and sale of land, and they therefore appear to sufficiently affect commerce. Finally, the Corporate Defendants have pled that Plaintiff's actions resulted in large capital and asset losses. Plaintiff's Motion to Dismiss the UDTPA claim in Count VIII of the Counterclaim is denied.

### 7.     **Failure to State a Claim for Conversion**

Plaintiff argues that the Counterclaim for conversion should be dismissed because it only applies to chattels and that Corporate Defendants fail to allege that any asserted transfers were involuntary. As discussed above, both Pennsylvania and North Carolina law permit a claim for conversion with respect to money or monetary funds.

The Corporate Defendants plead that Stillwagon fraudulently took, transferred and misappropriated capital and land lots without authority or approval. ECF No. 51 at ¶¶ 137, 158, 166, 178-86, 191, 187, 198, 208-13, 203. Stillwagon cites to Pennsylvania caselaw for the proposition that the transfer was not involuntary. *See Thomas v. Phila. Hous. Auth.*, No. 10-6185, 2011 WL 2415157 (E.D. Pa. June 15, 2011). In *Thomas*, plaintiffs brought a conversion cause of action against the defendants for improperly requiring them to attend a training session

and charging a $200 admission fee. *Id.* at 8. The court found that the payment of the fee was voluntary because it was "different from an allegation that Plaintiffs' money was taken without their consent." *Id.* at 9. Here, however, the Corporate Defendants explicitly allege that Stillwagon took these actions without the necessary approval or consent.

Furthermore, the North Carolina Court of Appeals has held that a conversion claim was viable where defendant was listed on a joint bank account with plaintiff, plaintiff had given defendant a power of attorney, and defendant withdrew plaintiff's money from the account. *Gadson v. Toney*, 316 S.E.2d 320, 322 (N.C. Ct. App. 1984). The court held, on a motion for summary judgment, that there was sufficient evidence that plaintiff was the owner of the money and that defendant "wrongfully assumed and exercised the right of ownership over that property to the exclusion of plaintiff's rights as owner." *Id.* The Corporate Defendants' allegations are sufficient to overcome a Motion to Dismiss as to Count X of the Counterclaim.

### 8. Damage Claim is Improper and Excessive

While the Corporate Defendants' various listings of the specific amount of claimed damages appear to exhibit sloppy comma placement, ECF No. 51 at ¶¶ 251, 257, 282, they are fairly construed to seek damages only in excess of the jurisdictional amount contained in 28 U.S.C. § 1332. Thus, Plaintiff's Motion to Dismiss is denied in this respect.

### C. CONCLUSION AS TO THE MOTION TO DISMISS PURSUANT TO 12(b)(6)

Plaintiff's Motion to Dismiss Counterclaims for failure to state a claim is granted as to Counts I (only with respect to the claim of breach of fiduciary duty as an attorney), II (only as regards the claim for unjust enrichment), and VII. These dismissals as to Counts I and II are without prejudice. Plaintiff's Motion to Dismiss Counterclaims for a failure to state a claim is otherwise denied in all respects. Counts IV, VI, IX, and XI have been dismissed without

prejudice under Fed. R. Civ. P. 12(b)(7).[32] Because the Corporate Defendants' Counterclaims for breach of fiduciary duty as an officer, director, and accountant (Count I), breach of contract (Count II), civil conspiracy (Count III), misrepresentation (Count V), unfair and deceptive trade practices (Count VIII), and conversion (Count X) survive the Motions to Dismiss under both Fed. R. Civ. P. 12(b)(6) and 12(b)(7), the Court must now consider the Motion to Transfer Venue.

## VI.   MOTION TO TRANSFER VENUE

### A.   APPLICABLE LAW

A motion to transfer venue is governed by 28 U.S.C. § 1404(a), which provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The purpose of transferring venue under § 1404(a) "is to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964) (internal quotation omitted). In determining if transfer of venue is appropriate, "the district court is vested with a wide discretion." *Plum Tree, Inc. v. Stockment,* 488 F.2d 754, 756 (3d Cir. 1973); *CentiMark Corp. v. Jacobsen,* No. 11-1137, 2011 WL 6000719, at *2 (W.D. Pa. Nov. 30, 2011). The movant has the burden of showing that the balance of private and public factors weighs strongly in favor of transfer. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995) ("plaintiff's choice of venue should not be lightly disturbed.") (citations omitted).

A court performs a two-part analysis when considering a motion to transfer venue. *CentiMark,* 2011 WL 6000719, at *2 (citing *Lawrence v. Xerox Corp.,* 56 F. Supp. 2d 442, 450–

---

[32] Because Counterclaims IV and XI are dismissed pursuant to Rule 12(b)(7), it is premature to consider Plaintiff's argument that these claims should be dismissed under Rule 12(b)(6).

51 (D.N.J. 1999)). First, the court must decide whether the case could have been brought in the transferee district in the first instance, i.e., whether venue in the transferee district proper. *Id.* Second, the court applies the *Jumara* factors, which considers a number of public and private factors to determine which forum is most appropriate to consider the case. *Id.*[33]

> The private interests include:

> plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*Jumara*, 55 F.3d at 879.

> The public interests include:

> the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879-80.

## B.   THE PARTIES' ARGUMENTS

Stillwagon argues that because he is a resident of Pennsylvania and he performed a substantial amount of work in Pennsylvania, his choice of venue should not be disturbed.  ECF No. 66 at 8.  Stillwagon also notes that the Severance Agreement did not contain a forum

---

[33] The Third Circuit in *Jumara* explained the balancing test for a transfer of venue:

> In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum. While there is no definitive formula or list of the factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).

55 F.3d at 879 (quotations and citations omitted).

selection clause and that Defendants used his office in Pennsylvania as a satellite business office for their operations. *Id.* at 8-9.[34]

The Rieders assert that an analysis of the *Jumara* private and public factors show that the Eastern District of North Carolina is the "substantially more convenient forum." ECF No. 60 at 15-18. They argue that the Severance Agreement explicitly considers North Carolina law, the purpose of the relationship and all of Stillwagon's work was aimed at achieving objectives in North Carolina, potential witnesses[35] and relevant documents are located there, and this availability will make the litigation more expeditious and less costly. Moreover, they argue, North Carolina courts are better equipped to handle that state's laws, and that North Carolina has a strong interest in deciding controversies that affect its businesses.

The Corporate Defendants join the Rieders in these arguments. They also deny that Plaintiff was engaged to perform services from his office in Pennsylvania and note that "the

---

[34]    In his Response to the Rieders' Motion to Transfer, Plaintiff argues that based on the result of a commercial arbitration previously conducted in North Carolina, the "Defendants' counterclaims in this action, as well as all claims that could have been raised in [the Defendants' arbitration action against Ware], are barred by the doctrine of *res judicata* and/or collateral estoppel." ECF No. 66 at 8. While this argument is more properly asserted by way of a Motion for Summary Judgment, his argument nonetheless appears to fall short.

First, the doctrine of res judicata is likely inapplicable because Stillwagon was not a party to the arbitration action, and he does not allege that he was in privity with a party in the arbitration. *See Williams v. Peabody*, 719 S.E.2d 88, 94 (N.C. Ct. App. 2011) (both the party asserting *res judicata* and the party against whom *res judicata* is asserted much be either parties, or stand in privity with those parties, to the original action); *Duhaney v. Attorney Gen. of U.S.*, 621 F.3d 340, 347 (3d Cir. 2010) (same).

Secondly, collateral estoppel bars relitigation of only those factual issues actually litigated and determined in the original action. *Williams*, 719 S.E.2d at 93; *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009) (same). The issues that the Corporate Defendants raise in their Answer and Counterclaims appear to differ from those in that arbitration action against Ware. Whether or not Ware breached an oral contract or his fiduciary duty as a general contractor to Defendants is not the same issue as whether Stillwagon breached an oral contract or his fiduciary duty to Defendants. Moreover, the Corporate Defendants appear to raise claims that did not arise in the Ware arbitration, such as conversion by Plaintiff. There is also a question as to whether Stillwagon should benefit from the doctrine of collateral estoppel, and whether Defendants had a "full and fair opportunity" to litigate the key issues in the arbitration, because Plaintiff allegedly withheld "40 bankers boxes of documents" from Defendants for use in the arbitration. ECF No. 51 at ¶¶ 223-24. For these reasons, this "defense", if it has legs at all, will have to stretch them in the North Carolina court.

[35] For instance, the Rieders list the following North Carolina individuals and entities as those believed to have participated in or facilitated Stillwagon's fraud: Bobby Ware, Lynn Berry, Linda Ware, Mark Ware, Chris Catron, Billy Pritchett, Jay Price, Bobby Ware Builders, William C. Stillwagon, P.C., Great Atlantic Equipment Leasing, Northeastern Excavating and Underground, The Fence Company, Sunny Days Landscaping, Kris Gray Construction, Coastal Contractors, Albemarle Land Management, and Innsbrook Realty. ECF No. 60 at 17-18.

parties clearly intended that any dispute arising out of the subject contract would be governed by North Carolina law." ECF No. 51 at ¶ 11; ECF No. 63 at 2-3.

## C.    **ANALYSIS**

### 1.    **Venue**

The Supreme Court recognized that under § 1404(a), a civil action may be transferred by a district court to another district court where that action may have originally been brought by the plaintiff. *Hoffman v. Blaski,* 363 U.S. 335, 343 (1960). To determine whether this action could have been brought originally in the United States District Court for the Eastern District of North Carolina, we must determine whether venue would have been proper there in the first instance. The general venue provisions set forth in 28 U.S.C. § 1391 provide, in relevant part:

> (b) Venue in general.--A civil action may be brought in-- (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Venue is proper in the Western District of Pennsylvania where the Plaintiff resides and allegedly performed a substantial amount of his work. Venue would also have been proper, however, in the Eastern District of North Carolina because a substantial part of the events or omissions giving rise to the Plaintiff's breach of contract claim, and the fact of the breach would have also occurred there. Defendants' principal places of business are in North Carolina and Plaintiff traveled to and directed all of his work to that forum. Presumably, the decisions to stop

paying Plaintiff were either made or implemented, in that state.[36]   Consequently, Stillwagon
could have initially brought this case in the Eastern District of North Carolina.

Given that this action is transferrable to the Eastern District of North Carolina, the Court
must now determine whether transferring the case would in fact be "[f]or the convenience of
parties and witnesses [and] in the interest of justice." 28 U.S.C. § 1404(a).  In doing so, we must
look to the factors set forth by the Third Circuit in *Jumara*.

### 2.    **Private Factors**

#### a.    **Parties' Choice of Forum**

The Court first considers the parties' choice of forum. "[I]n ruling on defendants' motion
the plaintiff's choice of venue should not be lightly disturbed." *Jumara*, 55 F.3d at 879.  This is
especially true when a plaintiff's choice is his home forum.  *Samsung SDI Co. v. Matsushita
Elec. Indus. Co.,* 524 F. Supp. 2d 628, 631 (W.D. Pa. 2006).[37]  At the same time, the Court must
also consider the defendants' preferences. *Jumara*, 55 F.3d at 879.  Here, although both the
Rieders and the Corporate Defendants have expressed a preference for a North Carolina forum,
on balance, this factor (even in the context of the Counterclaims) weighs in favor of Plaintiff, as
he not only brought suit in this judicial district, but also resides here.

#### b.    **Physical and financial condition of the parties**

All parties appear to have sufficient resources to litigate this case outside of their chosen
forum.  Neither party argues that litigating the case in either judicial district would be unduly
onerous.  At the same time, each party would doubtless find it more convenient to litigate on its
home court.  At oral argument, Plaintiff's counsel stated that Stillwagon is still working and that

---

[36] Further, Plaintiff asserts that he could have sued the Rieders in any district as foreign nations, pursuant to 28
U.S.C. § 1391(c)(3), and therefore venue would also be proper under § 1391(b)(1).

[37] However, when "few of the operative facts underlying [the] claims took place in the [current] District . . . this
choice is entitled to less deference than otherwise."  *Headon v. Colorado Boys Ranch*, No. 204-cv-004847, 2005
WL 1126962, at *4 (E.D. Pa. May 5, 2005).

his health is adequate. The pleadings indicate that Stillwagon and the Rieders travel out of their home states often enough that it would not be an unreasonable burden for either to litigate elsewhere. Moreover, Stillwagon entered into and engaged in the business relationships at issue here knowing full well that his work responsibilities would be directed at North Carolina and would necessarily require intermittent travel to the properties located there.

Conversely, while the pleadings do not indicate the financial position of the Corporate Defendants, they seemingly deal in large real estate transactions frequently. However, the Court is unaware of any business by the Corporate Defendants in Pennsylvania. Considering these factors as a whole, this factor does not pull strongly in either direction.

### c. Locus of Origin of Claims

The Court also considers "whether the claim arose elsewhere." *Jumara,* 55 F.3d at 879. This consideration focuses on where the activities relevant to the claims at issue took place. *See Van Cauwenberghe v. Biard,* 486 U.S. 517, 529 (1988) (the "locus of the alleged culpable conduct" determines the place where the claim arose); *Leroy v. Great W. United Corp.,* 443 U.S. 173, 185-86 (1979) (important factor in determining where a claim arises is where the conduct occurred that provided the basis for the claim); *Days Inn Worldwide, Inc. v. Inv. Prop. of Brooklyn Ctr., LLC,* Civ. No.08–390, 2009 WL 3153277, at *4 (D.N.J. Sept. 25, 2009) (where "the operative facts occurred."). "In contract actions the simplest and most logical answer to the question of where the claim arose is place of performance." *J.L. Clark Mfg. Co. v. Gold Bond Corp.,* 629 F. Supp. 788, 791 (E.D. Pa. 1985).[38]

With regard to the Severance Agreement, according to Plaintiff's Second Amended Complaint, "numerous discussions [regarding the agreement] . . . took place in North Carolina

---

[38] Some courts have found that a claim arises where negotiations took place, *Strategic Learning Inc. v. Wentz,* No. 04-4341, 2005 WL 241182, at *3 (E.D. Pa. Feb. 1, 2005), and others where payment is to be made. *Fin. Am. Credit Corp. v. Kruse Classic Auction Co., Inc.,* 428 F. Supp. 135, 137 (E.D. Pa. 1977).

and in Pennsylvania." ECF No. 47 at ¶ 44. Also, Stillwagon signed the contract in Pennsylvania before forwarding it on to Austria for Defendants to sign. However, the situs not "particularly important" where each party signed the contract "in their respective locations and communications traveled back and forth." *Perry v. Markman Capital Mgmt., Inc.*, No. 02-744, 2002 WL 31248038, at *10 (E.D. Pa. Oct. 4, 2002).

The Severance Agreement served to ultimately settle the issue of remuneration that Defendants owed Stillwagon for his work in North Carolina and to end their business relationship. Severance Agreement at ¶¶ 1-4. Moreover, without containing a forum selection clause, the Severance Agreement evidences the parties' intentions in that they agreed that "[t]his Agreement has been negotiated and executed in the State of North Carolina and is to be performed in the State of North Carolina." *Id.* ¶ 10. Although this claim arguably arises out of activities in both North Carolina and Pennsylvania, the Court considers this consideration to pull somewhat in favor of transfer.

Both the Plaintiff and the Corporate Defendants allege the breach of oral contracts for work performed on North Carolina projects. ECF No. 47 at ¶ 57; ECF No. 51 at 47. The pleadings do not state where the negotiations for these purported contracts took place. While Stillwagon asserts that he completed a substantial amount of work from his office in Pennsylvania, it is hard to ignore the reality that the business relationship was formed and run with the purpose of real estate development in North Carolina and that Plaintiff directed all of his work to that forum. Because the most significant contacts and the operative facts which give rise to the causes of action for breaches of oral contracts took place in North Carolina, these claims arose within that forum.

Finally, the Corporate Defendants' numerous surviving Counterclaims plainly can be said to arise in North Carolina, as it was the center of gravity of the alleged unsavory activity. The Counterclaims generally sound in fraud alleging a scheme designed to improperly take Defendants' capital and assets as well as breach of fiduciary duty, and arise from Stillwagon's purported mishandling or looting of the companies and their assets. North Carolina is the forum in which Stillwagon was charged with managing companies and their projects, where his duties and conduct allegedly fell short of what was required by his position or where he acted in contradiction to the law, and where the injuries from that conduct arose.

Because the key events giving rise to the alleged Counterclaims took place in the Eastern District of North Carolina, this factor strongly favors a transfer of venue to North Carolina. *See Hayes v. Transcor Am., LLC*, No. 08-293, 2009 WL 1795309, at *4 (E.D. Pa. June 23, 2009) (when the vast majority of the acts giving rise to the claims in the action take place in another forum, that weighs heavily in favor of transfer); *Cancer Genetics, Inc. v. Kreatech Biotechnology B.V.*, No. 07-273, 2007 WL 4365328, at *5 (E.D. Pa. Dec. 11, 2007) ("When the chosen forum has little connection with the operative facts of the lawsuit, such that retaining the action conflicts with the interests in efficiency and convenience, other private interests are afforded less weight.").

### d. **Convenience of the witnesses**

The next factor is "the convenience of the witnesses — but only to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Jumara,* 55 F.3d at 879.[39] "[I]n reviewing a motion to transfer, courts frequently look to the availability of witnesses as an important factor, as it can be relevant to protecting a defendant's opportunity to put on its case with witnesses who will appear in person at the trial." *ADE Corp. v. KLA–Tencor Corp.,* 138 F.Supp.2d 565, 569 (D. Del. 2001); *see also id.* at 574 ("The court does have an interest in seeing that a plaintiff's choice of a forum does not deprive a defendant of its ability to put on a defense that effectively communicates the matters in issue to the judge and the jury."); *Lehr v. Stryker Corp.,* No. 09-02989, 2010 WL 3069633, at *5 (E.D. Pa. Aug. 4, 2010) ("Given the fact that, when possible, live testimony is preferred over other means of presenting evidence, the convenience of the non-party witnesses weighs most heavily on the Court in deciding on a motion to transfer venue.") (citation omitted).[40]

---

[39]     The Court agrees with Chief Judge Sleet that the weight to be accorded to convenience of the witnesses varies depending on the type of witness at issue:

> Party witnesses or witnesses who are employed by a party carry no weight in the 'balance of convenience' analysis since each party is able, indeed, obligated to procure the attendance of its own employees for trial. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the 'balance of convenience' lies (especially in an action for patent infringement) because they are usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any. Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis.

*Affymetrix, Inc. v. Synteni, Inc.,* 28 F. Supp. 2d 192, 203 (D. Del. 1998) (internal citations and quotations omitted).

Thus, the consideration of non-party, non-employee, non-expert witnesses weighs heavily in a transfer of venue analysis. *Id. See also Hillard v. Guidant Corp.,* 76 F. Supp. 2d 566, 570 (M.D. Pa. 1999) ("The law on the transfer of cases distinguishes between party and non-party witnesses. The party witnesses are presumed to be willing to testify in either forum despite any inconvenience. The convenience of non-party witnesses is the main focus.").

[40] *See also* 8 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* § 3851 (3d ed. 2012) ("Often cited as the most important factor in passing on a motion to transfer under Section 1404(a) . . . and the one most frequently mentioned by the courts, . . . is the convenience of witnesses, most particularly nonparty witnesses who are important to the resolution of the case. According to the courts, if the forum initially chosen by the plaintiff will be the most convenient for the witnesses, this is a powerful argument against transferring the case.

The Rieders and the Corporate Defendants argue that the potential non-party witnesses in this action are located in North Carolina, not in Pennsylvania. For instance, they reference the following North Carolina individuals and entities as those they believe participated in or facilitated Stillwagon's alleged wrongful conduct: Bobby Ware, Lynn Berry, Linda Ware, Mark Ware, Chris Catron, Billy Pritchett, Jay Price, Bobby Ware Builders, William C. Stillwagon, P.C., Great Atlantic Equipment Leasing, Northeastern Excavating and Underground, The Fence Company, Sunny Days Landscaping, Kris Gray Construction, Coastal Contractors, Albemarle Land Management, and Innsbrook Realty. ECF No. 60 at 17-18 (citing the Corporate Defendants' RICO statement, ECF No. 40 at 2). Stillwagon has not specifically identified any potential witnesses in either Pennsylvania or North Carolina in his Amended Complaint or Response to the Motions to Transfer.

Moreover, Ware and his entities are central to the scheme that the Corporate Defendants, in their Counterclaims, allege that Stillwagon carried out. Ware's involvement with Stillwagon serves as part of the basis of the Corporate Defendants', and potentially the Rieders', defenses and Counterclaims. Accordingly, Ware, his employees, and his company's documents will likely play a key role in this litigation. Ware is a North Carolina resident and all of his entities exist under the laws of North Carolina, and none have been named as a party. Because Defendants implicate them in a fraudulent scheme, they are unlikely to voluntarily travel to Pennsylvania to willingly participate in this case.[41]

---

On the other hand, again in the judgment of countless federal courts, if some other forum will serve the convenience of the witnesses better, a motion to transfer under Section 1404(a) is significantly more likely to be granted.").

[41] Federal Rule of Civil Procedure 45(b) provides that a subpoena may be served within the District of the issuing court, within 100 miles of the place specified, within the state if the state statute or court rule allows, or if a federal statutes so provides. Presumably, none of the above witnesses are located within this district, state, or within a 100 mile radius, and the parties have failed to point to any other subpoena-empowering rule. To the Court's best knowledge, all of the above witnesses and any of their documents lie outside of this Court's subpoena power.

While the risk of a case going to trial with crucial witnesses outside of the Court's subpoena power who refuse to testify is one faced by all parties to a case, here, where none of the listed potential non-party witnesses are within this Court's subpoena power, but all are presumably within the proposed transferee Court's subpoena power, this factor weighs heavily in favor of transfer. *Headon v. Colo. Boys Ranch*, No. 204CV04847LDD, 2005 WL 1126962, at *7 (E.D. Pa. May 5, 2005) (granting motion to transfer and noting that convenience of non-party witnesses is "perhaps the most important factor"); *Jahncke Serv., Inc. v. OKC Corp.,* 301 F. Supp. 866, 868 (D. Del. 1969) (transferring the case because, *inter alia,* "nearly all the witnesses" were located in Louisiana, Texas, and Oklahoma).

### e.    Location of the books and records

The Court, in its previous opinion with regard to the Plaintiff's breach of contract claims, stated that "to the extent it would become relevant, some portion of the evidence of the parties' dealings, such as meeting minutes and bank transactions, would likely be located [in Pennsylvania]." *Transfer Opinion I*, 2012 WL 501685, at *5. However, in light of the Corporate Defendants' Defenses and surviving Counterclaims, the body of evidence likely required at trial has now substantially broadened. According to those pleadings, corporate bank accounts were established in both Pennsylvania and North Carolina, and that factor is therefore a wash. ECF No. 47 at ¶¶ 28-29; ECF No. 51 at ¶¶ 29, 140; ECF No. 66 at 3. In their Counterclaims, the Corporate Defendants point out that Stillwagon has turned over forty-four (44) "bankers boxes" of documents to the Corporate Defendants. While "technological advances would seem to limit the import of this factor" because technologies have lessened the burden of storing and transmitting data, *Samsung SDI Co., Ltd. v. Matsushita Elec. Indus. Co.*, 524 F. Supp. 2d 628, 633 (W.D. Pa. 2006), other potential evidence pushes this factor in favor of transfer.

Additional materials may likely now include the registration or corporate existence documents of the involved companies, property titles (for the allegedly improper sale or transfer of property), and any equipment improperly used to perpetrate fraud all of which likely remain in North Carolina. As noted above, the Corporate Defendants' Answer places Ware and his entities squarely in the fray even though they are not parties to this suit. As all are North Carolina entities, their company documents and bank records are likely maintained in that state, outside of the subpoena power of this Court. As the bulk of the evidence is to be found in North Carolina, this factor also significantly supports a transfer to North Carolina.

### 3. Public Factors

#### a. Enforceability of the Judgment

The enforceability of any judgment rendered in this Court does not appear to be an issue. Neither party contends that a judgment rendered here would be any less enforceable than one obtained in a North Carolina court or vice versa.[42] This factor, therefore, receives little weight in either direction.

#### b. Practical Considerations that Could Make the Trial Easy, Expeditious, or Inexpensive

Whether the litigation proceeds in Pennsylvania or in North Carolina, someone is going to have to travel somewhere (assuming that there is personal jurisdiction in the ultimate forum, the Rieders will have to travel from Austria regardless of the court). However, practical considerations regarding the efficiency and economy of conducting the trial weigh in favor of transfer to the Easter District of North Carolina.

The majority of the operative facts giving rise to the litigation as now shaped occurred in North Carolina. Consequently, the majority of the documents and, so far, all of the potential

---

[42] At oral argument, the Corporate Defendants stated that while they saw no problem with enforcement if the case were litigated in North Carolina, it was also a risk they were willing to take.

non-party witnesses reside in that forum. The transfers of land, workers hired and entities created, and the business relationship that led to the Severance Agreement, were all directed towards and within the borders of North Carolina. *See Travelodge Hotels, Inc. v. Perry Developers, Inc.*, No. 11-1464, 2011 WL 5869602, at *7 (D.N.J. Nov. 22, 2011) (noting that it would likely be less expensive and more efficient for the case to proceed in the locale where the breach occurred).

One of the most persuasive elements is the practical considerations concerning the scope of this Court's subpoena power. As previously noted, all of the above referenced non-party entities and individuals are outside of the Court's subpoena power. Discovery disputes may lead to a lengthier-than-usual litigation process, and either party's inability to obtain documentary or testimonial evidence threatens achieving a just resolution of these disputes. Accordingly, this factor weighs in favor of transfer.

**c.    Relative Administrative Difficulty Resulting from Court Congestion**

Another factor to be considered is the relative congestion present in the competing district courts. According to the 2012 Federal Court Management Statistics, the civil docket of the Western District of Pennsylvania is less congested than that of the Eastern District of North Carolina. As of September 30, 2012, that North Carolina District had 769 civil cases pending per judge with a weighted filing "score" of 697, and the average time from filing to trial was 44.8 months. In this District, there were 278 pending civil cases per judge with a weighted filing "score" of 329. Here, the average time from filing to trial as of September 30, 2012 was 32.5 months. "[W]hat is relevant to the question of whether to transfer a case, and undoubtedly what the courts have in mind in writing opinions that give significant weight to this element is that

getting to trial may be speedier in another district because of its less crowded docket." 15 Wright et al., Fed. Prac. & Proc. Juris. § 3854 (3d ed.).

These statistics give the Court great pause. This Court is ardently averse to the idea of contributing to the workload of one of its sister courts, especially one as busy as the Eastern District of North Carolina, but the interests of justice, fairness, and convenience considered as a whole are strongly in favor of a transfer of venue. Given that all of the property and the thrust of the operative facts, evidence, and witnesses potentially involved in this case lie in North Carolina, it is plain that it is the better, and substantially more appropriate, forum to decide these claims. Moreover, while, on average, civil cases get to trial somewhat more quickly here, without subpoena power, potential discovery disputes and the absence of witness participation threatens to generate a lengthier-than-normal process here that may result in less than a just result if a substantial portion of the testimony and other evidence is unavailable to the litigation. While only one of many factors, on balance, this factor nonetheless weighs against a transfer of venue.

### d.    Local Interest in Deciding Local Controversies at Home

In contrast, the "local interest factor" weighs in favor of transfer to North Carolina. Pennsylvania has an obvious interest in ensuring that contracts are enforced and in protecting its residents. Likewise North Carolina has a strong interest in protecting the interests of companies formed under its laws and located within its borders.[43] North Carolina also has an interest in overseeing its corporations and companies to ensure that these entities are not being created for the purpose of perpetrating fraud. Moreover, part of the alleged fraudulent scheme here involves the improper sale or transfer of properties in North Carolina. Any forum has a compelling

---

[43] The Rieders argue that this is particularly true when the companies are located solely within that forum's borders, ECF No. 60 at 18, as opposed to national or global companies.

interest in ensuring that its property titles are legal and without fraud poisoning the lines of ownership. Finally, and most importantly, the business relationship between Stillwagon and the Corporate Defendants was created for the purpose of purchasing, selling, and developing properties within North Carolina. While Stillwagon may have completed a substantial amount of his work from his office in Pennsylvania, it is hard to overlook the reality that all of his work was directed towards North Carolina and that his remuneration directly depended on his business success in that forum. This factor therefore favors transfer.

### e.     Public Policies of the Fora

As to the public policy factor, none of the parties have addressed this issue. As already discussed, both states have an obvious interest in adjudicating this dispute, however this factor tips in favor of transfer to North Carolina. "When both states have an interest in adjudicating the case, this Court has found the balance to tip in favor of the State that was found to be the center of gravity of the actions giving rise to the litigation." *Travelodge Hotels*, 2011 WL 5869602, at *7. The parties entered into a business relationship that was squarely directed towards North Carolina. Stillwagon's services were employed in order to purchase, develop, and resell properties located in North Carolina. Moreover, whether or not his actions were fraudulent, Stillwagon created multiple entities under North Carolina law and enlisted North Carolina residents and entities, which may now be potential witnesses, to help carry out his work. Understandably, Stillwagon worked from his office in Pennsylvania and even carried out related business meetings there, but it is beyond a doubt that the vast majority of the operative facts now at issue were allegedly carried out in and directed towards North Carolina. This factor also favors transfer.

###### f. Familiarity of Trial Judge with the Applicable State Law

As discussed above, the law of the forum state applies to claims for breach of oral contract, breach of fiduciary duty as an accountant, unjust enrichment, conversion, and civil conspiracy. These Counterclaim Counts are thus non-factors in this analysis. The only issue in the case as to which Pennsylvania law certainly applies is as to the counterclaim for breach of fiduciary duty as an attorney (Count I). North Carolina law plainly applies to the following issues and claims: breach of the Severance Agreement (Count I of the Complaint), unfair and deceptive trade practices (Count I of the Counterclaim), breach of fiduciary duty as an officer or director (Count VIII of the Counterclaim), Gist of the Action doctrine, and the economic loss rule.

While this Court does not doubt its ability, generally speaking, to understand and apply North Carolina law, there is no question that a federal judge sitting in North Carolina is in a better position to apply North Carolina law. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 186 (1979) ("federal judges sitting in Idaho are better qualified to construe Idaho law, and to assess the character of Idaho's probable enforcement of that law, than are judges sitting elsewhere."). Therefore, this factor supports a transfer of venue.

## VII. CONCLUSION

Unless the balance is strongly in favor of the defendant, "the plaintiff's choice of venue should not be lightly disturbed." *Jumara*, 55 F.3d at 879. While the condition of the parties and the enforceability of a judgment are essentially non-factors, and the Plaintiff's choice of forum and court congestion weigh in favor of this action remaining in this District, all of the remaining *Jumara* factors weigh (and most do so strongly) in favor of a transfer of venue to North Carolina. In particular, practical considerations concerning the scope of this Court's subpoena power, the location of non-party witnesses and documents, and the familiarity of a North Carolina federal

56

judge with North Carolina state law suggest the value of a transfer. Finally, based on all of the pleadings, the Court is unable to overlook the hard fact that the relationships among these parties and the viable disputes at issue here center on North Carolina. Therefore, after thoroughly considering the Plaintiff's claims, and the Corporate Defendants' defenses as well their surviving Counterclaims, all in the context of the *Jumara* factors, the Court grants Defendants' Motion to Transfer this action to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404(a).[44]

An appropriate Order will enter.

Mark R. Hornak
United States District Judge

Dated: March 20, 2013

cc: All counsel of record

---

[44] The Rieders' Motion to Transfer alternatively sought to dismiss for lack of personal jurisdiction and moved for a more definite statement. ECF No. 59. The Corporate Defendants also joined in the latter motion. ECF No. 63. In light of the Court's decision to transfer this action, the Court will leave the decision on those alternative Motions to Dismiss for Lack of Personal Jurisdiction and for a More Definite Statement to the transferee Court, as that Court is far better situated to address these issues (if they even continue to be asserted), particularly if jurisdictional discovery is needed. Those Motions are therefore dismissed without prejudice, subject to reassertion in the North Carolina court.